Good morning, Your Honors. Tanya Linton for the appellant, Gasprom Inc. Good morning. Shall I launch into the argument, or do Your Honors have specific questions? Why don't you go ahead and launch. I think there will be some questions, but go ahead. The first item I would like to address this morning is the standard of review in this case. The appellant cites three independent reasons for the fact that the court's grant of a summary judgment on Gasprom's cause of action for breach of contract should be reviewed de novo, whereas ExxonMobil, the FOE in this case, indicates that the standard of review should be different. Specifically, the court dismissed the breach of contract cause of action in its entirety and on the merits, according to the court order. And the standard that ExxonMobil appears to advocate would apply to a motion to dismiss under Federal Rule 12B-6, and that is supported by the cases which are cited by ExxonMobil. Secondly, the court, the lower court, clearly erred in deciding that the reliance damages are not well, are not within the established contract damages, and there's ample authority cited for the fact that it's simple hornbook law that reliance damages are indeed an acceptable measure of damages within a cause of action for breach of contract. Let me start asking some questions now, because it sounds like you all have some history here. It looks like you've had some prior litigation and had settled, and so — Yes. Certainly at the core of this dispute was the settlement agreement and attachments to it. Right. And so it looks like you all have been discussing this and sort of in disagreement for some time. But I guess I'm trying to get to some of the main issues that arise here is why did GASPROM fail to file this DFIL application until after it applied for the permits. I'm trying to figure out the timing of everything and how it occurred. The DFIP, Your Honor, has hit upon one of the central issues here. The DFIP application was not given to GASPROM until after it had applied for the permits. Specifically, at the crux of the matter is the court's interpretation of a document entitled Memorandum of Preliminary Review, which on its face — which was admitted into evidence in the lower court trial as Exhibit 2, specifically 2A and 2B. And specifically the preliminary plans were submitted to ExxonMobil for review. And ExxonMobil, having been aware of the parameters of the DFIP, which is the Dealer Finance Improvement Program, made no objections to the clear plan, which showed removal of two fuel pumps. Well, and I guess that's where we are. It's a clear plan. Was it a clear plan? Did you need to affirmatively sort of notify, based on, I guess, your agreement, notify Exxon that you were going to remove two pumps? I know that there were diagrams presented that didn't show the pumps apparently that were given to Exxon. And then one of the employees, I think, response was, well, we had no real idea to expect that and that it would have been more fair and reasonable and really in accordance with their understanding that you would have notified them, especially since it was in the forecourt instead of the backcourt, if I recall correctly. And so it seems if there's going to be a removal of two gasoline pumps, you know, that that is rather significant. And should there not have been more done to highlight, notify Exxon with respect to that? Well, specifically, Your Honor, it is admitted by both sides that the very document that make up the DFIP program makes no mention of the fact that work on the forecourt, in other words, the fueling portion of the station, is prohibited. And that is admitted in the Gazprom at the settlement negotiations when the settlement was concluded or any time afterwards that the DFIP prohibited work on the forecourt, that is, the fueling portion of the stations. More importantly, the person, the first step of the DFIP was the submission of the plans. And there is no dispute that this was done by Gazprom. But the submission of the plan to Fairfax, Virginia, and the review of the plan by Mr. Taylor, who is an ExxonMobil engineer, specifically his job was to review DFIP applications. He made detailed notes on the plans and absolutely made no objection to the And did they give written confirmation accepting the plan? There was a written memorandum signed by Ina Williams, which said that subject to full compliance with DFIP, Gazprom was permitted to initiate the permit process. And therein I would like to make the bridge to the other crucial point here, and that is the only measure of damages found by Judge Gutierrez was the damages sustained by ExxonMobil as a result of, in the amount of $3,700, as a result of having to redesign the environmental improvement that they had to do. And the redesign was, so the only measure of damages awarded was the fact that they had to redesign it, and that was caused by the fact that Gazprom had submitted the plans to the city and obtained a permit. So Gazprom had done what it was authorized to do by the Memorandum of Preliminary Review. Well, I guess I can't, is it MPOR? Yeah, that's short for Memorandum of Preliminary Review. All right. Be read as requiring Gazprom to file additional plans showing full compliance with Taylor's proposed changes. I guess I'm trying to figure out why didn't Gazprom send an updated site plan to Exxon after they made the necessary changes to the site? The site plan was never changed. The site plan was always the same. The changes that Mr. Taylor outlined in his memorandum were immediately incorporated, and there is no dispute on that point. And I guess when did you file the DFIL application? Was it in October of 2008? It was in the permit. The settlement was reached in 2006. The permits with the city were applied for in 2007, and the DFIL application was submitted in 2008. However, I should point out that all Was it October of 2008? Because it seemed like, did it happen the same month Exxon filed the suit against Gazprom? I'm just trying to figure out, was that just coincidental or what caused Gazprom to file the DFIL application in October of 2008, which I think is the same month Exxon filed the suit against Gazprom? I don't recall the exact month the suit was filed. It might have been served at some point later, but the ExxonMobil insisted on the completion of the DFIP application, which was done. The central point, though, is that all sites except that the initial step of in the DFIP application. The other steps in the DFIP application have nothing to do with they have to do with financing, pricing, feasibility, business plan, and have nothing to do with the actual work to be performed on the site. And to I'll be happy to answer any other questions. Otherwise, I would proceed with the rest of my argument. Okay. You may. Thank you, Your Honor. Did you want to reserve some time? You're at ten minutes now. I don't know if you wanted to reserve some time for rebuttal. I would like to reserve a few minutes for rebuttal, but the couple of central points to which I would like to get to currently is the failure of the Court to consider the affirmative defense of mitigation of damages. That is a crucial point. The three ExxonMobil employees admitted that the initial plan that ExxonMobil wanted to go with, that is the Healy system, could still be implemented if only the tank, the separator tank, were moved. And Mr. Reed testified on the record that his marching orders were it's this or nothing. And although he thought they thought about moving the separator tank, no one ever gave the order to try and salvage the situation by sinking the two plants, by corroborating the two plants. And the statement of decision by the Court is completely silent on the affirmative defense of mitigating damages. ExxonMobil had every opportunity and the duty under the law to mitigate its damages. In other words, the only damages the Court found were $3,700, which Mr. Reed testified were the result of having to redesign the system and change to an EVR, which is a different method of accomplishing the environmental upgrade. However, the original plan could have been salvaged with a simple movement of the separator tank, which was the entire issue in the case. And three separate ExxonMobil employees testified to that fact. Finally, Your Honors, I would like to point out the, this case turns on the district court's interpretation of the famous document, Memorandum of Preliminary Review. And in that, in that sense, the, there is a CC, there's a California, there's a California code section which requires that specific term, terms of a contract or of a writing would predominate over general ones. Attached to the Memorandum of Preliminary Review was a specific plan with six pumps instead of eight. However, the lower court chose to give greater weight to the, to the general statement that the old provisions of the dealer finance improvement program had to be complied with when indeed there was a specific writing attached to the contract. Well, so I guess I just want to make sure I understand your position. Are you saying that you did submit the DFIP application timely or that you didn't need to? The position is that the damage, the damages found by the lower court were as pursuant to the statement of the court's decision as a result of Gazprom filing the application with the city. That was specifically permitted by the Memorandum of Preliminary Review. But still, I mean, whether it's tied to that or not, I guess I'm, I want to find out. Is it your position that you submitted the DFIP application timely or are you saying you didn't need to submit it? It's, our position is that it's immaterial under the, under the facts as they, as they occurred. Well, whether it's immaterial or not, did you, did you submit it? I mean, I just want to know if I got factual in it. The DFIP, the DFIP process itself is in two steps. The first, the first portion, and there's no dispute of this among the parties. The first portion of the DFIP involves the submission of a side plan, which there is no dispute was done. It was submitted to Fairfax, Virginia for review. And no one has ever argued that it was not so, it was not so. The, then, then the Gazprom's position is that after that was done, Gazprom, on the basis of the Memorandum of Preliminary Review, was free to do what it did, and that is initiate the entitlement process with the city and municipal authorities. The rest of the formal, formal application for the DFIP, A, was not given to, was not given to Gazprom at the time the contract was made, the settlement, and B, it had nothing to do with the aggrieved action for which ExxonMobil was awarded damages. Specifically, the court repeatedly specified that the damage occurred because Gazprom went to the city and pulled the permits. That portion, that action of Gazprom was specifically authorized by the Memorandum of Preliminary Review, and the Memorandum of Preliminary Review was, indeed, part of the DFIP. And there's no dispute on that issue, either, among the parties. If you want to reserve the rest of your time, please. Yes. Okay. Thank you. Good morning, Your Honors. My name is Mark Rocheford. I represent ExxonMobil Corporation. And with the Court's permission, I would like to begin by addressing a couple of points that counsel for Gazprom just raised. The first is, excuse me, I have a little bit of that flu that's going around. I apologize to the Court. The first is, Your Honor, on the timing of submission of ExxonMobil delivering the DFIP package to Gazprom versus Gazprom applying for a permit with the city. As we state in our briefs, Mr. Watson had given the package to Gazprom earlier in May of 2007. Excuse me. Yes, 2007. And Gazprom made its application in ñ later than that, in 2007. And that's found not only by the records in Mr. Watson's testimony, but also, Your Honor, in the pretrial conference order, the admitted facts, admitted fact number 8, sets forth the May 17, 2007 date that's on, by the way, on excerpt of record, page 134, and stipulated fact number 2 talks about the package of materials. The point, however, Your Honor, the second point I want to make, which is vitally important, is that counsel repeatedly argues, both in the reply brief and here, that nowhere was counsel ñ or, excuse me, was Gazprom aware that the DFIP program prevented work in the forecourt, in the environmentally sensitive forecourt. And I wish to address Your Honor's attention to stipulated fact number 4 in the pretrial conference order at the excerpt of record, page 137, in which Gazprom agreed with ExxonMobil that the dealer-financed improvement program does not permit improvements by the dealer to the so-called forecourt of the marketing premises, which includes the dispensers and related environmental equipment, islands, canopies, storage tanks, piping, and lines. That, you know, those are stipulated facts that Judge Gutierrez had when he tried this case, and those are facts that were borne out by the testimony at trial. So then let's focus on the notice and whether Exxon had notice. What's your response to that? Because there's a lot of reference to certain employees knowing things, and why shouldn't that be enough? I guess your engineer, Mr. Sistos, testified that he would have known that the forecourt was under construction simply by looking at Exhibit 2A, which was the plan attached to the MPOR. So I guess, you know, doesn't that indicate that the problem here was not that Gazprom didn't timely inform you of its intention to renovate the forecourt, but that your employees, such as I guess Ms. Williams and, you know, Williams and Mr. Taylor may have been negligent, or at least that's what is being suggested, in not noticing the forecourt changes in the plans submitted in the 2006 MPOR. Sure. The schematic drawing is a one-page drawing that shows the layout of the improvements. It was given to, it was given in connection with the settlement conference in the first litigation of the prior litigation. Ms. Williams was at the settlement conference. Another very senior Exxon employee was at the settlement conference. And Mr. Craig Whitney, in-house counsel, was at the settlement conference. Shortly thereafter, Gazprom produced the drawing which became attached to the MOPAR, the MOPAR. And that's the drawing that shows the six dispensers. The drawing, the evidence shows that the drawing was given to Mr. Whitney. Mr. Whitney sent it back to Fairfax, Virginia, to Mr. Taylor, who supervised the DFIP program. Mr. Taylor was an engineer. The evidence was also very clear, and this is in the testimony of Mr. Sistos, that Mr. Taylor did not have access to existing drawings of the stations in Southern California. Those drawings are maintained in Southern California by an outside consultant. Now that's important because nowhere on this drawing does it show, in typical engineering or architectural fashion, a bubble that says reduce pumps from eight to six. It's simply a station plot that shows six drawings. So someone would have either had to, number one, been very familiar with the station, or number two, have reviewed drawings to see that there was a reduction. Why didn't Mr. Taylor do that? Because Mr. Taylor was told that this involved a car wash and a convenience store improvement. There was no suggestion in any of the commentary by Gazprom that there was going to be any work done in the forecourt of the station. Let me take that thread forward, then I want to go back to that forecourt-backcourt dichotomy. The drawing then came out by way of this MOPAR, this Exhibit 5 at trial, and Ms. Williams, who was brand new as an area manager, who had something like 300 plus stations under her control, and who had never visited the Gazprom, this is a car wash and a convenience store renovation only. So she didn't pick that up. It was not until two and a half years later when Mr. Sistos first saw that drawing, when he received a copy of it, and by the way, Your Honor is right, the DFIP application was not returned for over 18 months or until late October of 2008. We filed lawsuit right afterwards. So the people who reviewed or who saw that drawing, it was not brought to their attention that there was a reduction of dispensers, and they had no way to really to know that unless they did a very thorough investigation by drawing prior plans. Let me then show And I guess that's, I mean the question is whose problem is that? I mean is that Gazprom's problem or is that Exxon's problem, this lack of affirmative notification? I mean it sounds like there was some indication based on the drawings, but the right person didn't see it to recognize it. And I mean you can proceed, but I guess what evidence we can also answer, what evidence is there in the record that affirmatively communicated to Gazprom that the DFIP prohibited forecourt renovations either in the form of a document given to Gazprom or a communication by your employee? Okay. Well, two things. Well, those are two questions I'd like to answer them in reverse order. First of all, what was the evidence on that? Mr. Sam Preyas' testimony, Your Honor. Mr. Preyas testified that he had been in the business for many years. He had developed service stations for Chevron and for Union Oil and that he knew that it was common knowledge in the oil industry that the oil companies absolutely protected religiously their forecourt equipment. Pumps, dispensers, lines, environmental equipment. Why? Because it's environmentally important to them to make sure that that equipment remains inviolate. He knew that and he testified in his testimony, and I'll be happy to give you that citation, that he was well aware of that at all times, not only for ExxonMobil, but for all oil companies. That's number one. Number two, they stipulated, as I just read in the pre-trial conference order, that the oil companies would not be able to do that. So I don't think that's an issue here. Tell me again. They stipulated in the DFIP that they knew what? They stipulated in the pre-trial conference order. I'm sorry. And what was it? I just want to make sure I understood it. Stipulated fact number four of the pre-trial conference order, which is found on the excerpt of record submitted by GASPROM, volume one, page 137, number four, the dealer-financed improvement program does not permit improvements by the dealer to the so-called forecourt for the marketing premises, which includes the dispensers and the related environmental equipment, islands, canopies, storage tanks, piping, and lines. And so that was in the pre-trial conference order. The pre-trial conference order stipulated by the parties presented to Judge Gutierrez and in which he proceeded the trial. And Judge Gutierrez, Your Honor, had no problem finding that they knew that and that they violated that DFIP by commencing this process of pulling permits and on the brink of constructing the facilities. Your Honor, you also asked the question, you know, well, who should be at fault here? You know, who should be held responsible? Is it ExxonMobil for not digging back into its existing records and making a comparison, or is it GASPROM? And the answer is, Your Honor, clearly Judge Gutierrez determined it was GASPROM. Why? Because GASPROM had taken their, the reason that they had to reduce the number of dispensers was because the city, they had taken their plans to the city. This was before the settlement conference. They had taken their plans to the city. The city had said, you cannot build a car wash, you cannot expand your convenience store, which was what Exxon understood the project to be, until you put in more parking spaces. This was a very constrained site, and the only way they could put in more parking spaces was to eliminate one of the pump islands, two dispensers. So they knew that. Sam Preuss knew that. Tanya Linton knew that. At the time of the settlement conference, they did not tell ExxonMobil that this project, by the way, would also involve digging up all of the piping, eliminating dispensers and moving canopies. They didn't say that. They said all we want to do is add a car wash and expand a convenience store. That's what we were told. That was the basis upon which we reviewed the drawings. So then the parties get back together. Mr. Watson goes out in May of 2007. He gives the DFIP package to Gazprom, and he says, please fill this out. I understand Mr. Watson, by the way, was the territory manager. I understand that you want to build a car wash. Please fill this out, this application, and, you know, you can go get underway. They did not return that from May of 2007 until the end of October of 2008. Why? Because the DFIP application provided that they had to describe the project and all the changes they were going to make. And when they finally submitted it on the eve of the lawsuit, it said, indeed, they were eliminating two dispensers, reconfiguring the canopies, and all of that. In the meanwhile, Ms. Linton writes a letter when there was this difficulty with the EDR, enhanced vapor recovery. She writes a letter, and she says, I don't understand what the problem is. Our improvement project involves no underground construction whatsoever, and therefore, there shouldn't be any difficulties here. Well, of course, it provided massive underground construction. As Mr. Prias said, it would have been a mess of underground construction. So there was another event in 2008, April of 2008, where Gazprom consciously tried to divert us from the truth. So I think that it's only fair to conclude here that Judge Gutierrez took all of this evidence. He considered all of it. It's a fact-driven case. And he concluded that ExxonMobil did not indeed know the scope of this project and did not consent to this project, and therefore, Gazprom proceeding without further notification, without further consent, constituted a breach of contract, Your Honor. And so ultimately, I mean, I had asked a version of this previously, getting this preliminary approval of the plans from Ms. Watson, I believe, was simply not enough in your view? Yes, because it was given under false pretenses, Your Honor. That was the theory of our case. That was the theory on which the case was tried. And that was the view accepted by the trial court below, which we think was not an abuse of discretion. And certainly, his findings of fact in that regard are supported by substantial evidence, in fact, overwhelmingly supported by substantial evidence. The last point I would make, Your Honor, pending, of course, any further questions that the Court might have, is this business that ExxonMobil didn't mitigate its damages. I'm not going to read the record to you, Your Honor, but I would invite the Court, please, to look at Mr. Andre Reid's testimony, which is in Volume I of the ExxonMobil's excerpt of records. So it's EXER, page 102 through page 122. In there, Mr. Reid, who is a graduate engineer, describes in detail the various steps that he took, the various considerations that he made to move from the so-called Healy system to the Vita Root system, and why the Healy system became very impractical in light of the limitations of the Healy system. So I would invite the Court, please, to look at Mr. Reid's testimony, which is in Volume I of the ExxonMobil's excerpt of records.   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.       Thank you. Thank you. Thank you.  Gaspram was instructed to give its preliminary drawing to counsel. Counsel then forwarded to the designated person in Virginia. Gaspram did not know and could not possibly have been able to provide a full architectural plan with bubbles. Perhaps full architectural plans with bubbles would have been submitted. And very instructive is an excerpt from the testimony of both of Ms. Williams that I would like to read. This is the volume two of appellant's 401, lines 4 through 15. Ms. Williams testified, when this exhibit B, that is Taylor's notes, does it say anywhere or indicate that any changes to the forecourt are prohibited by DFIP does not include the forecourt. When you executed this document, you knew that the DFIP does not include the forecourt. Is that correct? Correct. And you never communicated it to anyone at Gaspram? No. The fact that there was some understanding between the executives of ExxonMobil about the parameters of the DFIP may not be chargeable to Gaspram. The document, the program description itself was included in evidence. And the employees of ExxonMobil admitted that nowhere in that pamphlet does it indicate that you cannot work on the forecourt. And the stipulated fact number four does not indicate that Gaspram knew about this or that any changes to the forecourt are prohibited by DFIP. And based on the testimony of later deposition testimony, and the fact is that according to ExxonMobil, the DFIP prohibits work on the forecourt. And also, Mr. Watson testified that nowhere does it say in the paperwork that he gave to Gaspram that you may not work on the forecourt. And finally, the timing, Your Honor, also hit upon a very important point. The timing as to when the DFIP application was given to Gaspram is also very important. It was the burden of ExxonMobil to establish that the transfer of the DFIP package to Gaspram preceded Gaspram's application to the city, which Judge Gutierrez found was the injury event, the event that caused damages to ExxonMobil. And that was not then. Mr. Watson testified that the site was reopened for ExxonMobil in May of 2007. That's Volume 2 of Excerpts 375, Lines 10 through 17. And he also testified that he didn't know when, but within several months of this date, he gave the documents to a representative of Gaspram. Thus, Gaspram received the DFIP package for the first time several months after May 2007, which is when it filed its application with the city. That is a fact. The application with the city was filed in May of 2007. That's stamped on the city application, which is a document that was admitted into the record. Are there any other questions I may address for the Court in the ten seconds remaining? Well, thank you very much. Appreciate that. Thank you both for your argument today. The case is now submitted. And we will be in recess. We are adjourned. All rise. The Court is adjourned. The Court is adjourned.
judges: Conlon, Pregerson, Murguia